UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. |
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE IN REM |
| v. | |
| $10,000.00, MORE OR LESS, IN UNITED STATES CURRENCY, AND ALL PROCEEDS THEREFROM, | |
| Defendant. | |

COMES NOW the United States of America, by and through Jenny A. Durkan, United States Attorney for the Western District of Washington, and Richard E. Cohen, Assistant United States Attorney for said District, and pursuant to Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, respectfully alleges as follows:

I.      **NATURE OF THE ACTION**

1.      This is a civil action in rem brought to forfeit and condemn to the United States of America the following property: $10,000.00, MORE OR LESS, IN UNITED STATES CURRENCY, AND ALL PROCEEDS THEREFROM ("Defendant Hit Money"), which constitutes or is derived from proceeds traceable to the crime of Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire, in violation of Title 18, United States Code, Section 1958, which is a "specified unlawful activity" under

Title 18, United States Code, Section 1956(c)(7)(A); therefore, the Defendant Hit Money is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C)..

## II.   JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345, and 1355, and Title 18, United States Code, Section 1958.

3.      This Court has venue pursuant to Title 28, United States Code, Section 1395 and Title 18, United States Code, Section 1958.

4.      The Defendant Hit Money is now and during the pendency of this action will be within the jurisdiction of this Court.

## III.   PROCEDURAL HISTORY

5.      On June 20, 2011, the Federal Bureau of Investigation ("FBI") timely perfected service of the seizure and forfeiture proceedings concerning the Defendant Hit Money via Certified U.S. Mail, Return Receipt Requested, on Daniel Kultin, at both his last known address, and care of attorney Jeff Robinson at 810 3rd Avenue, Suite 500, Seattle, WA 98104.

6.      On July 15, 22, and 29, 2011, the FBI published notice of the seizure and forfeiture proceedings concerning the Defendant Hit Money in the Wall Street Journal.

7.      On July 19, 2011, the FBI received a claim of ownership of the Defendant Hit Money filed by attorney James E. Lobsenz for Dr. Michael Emeric Mockovak.

8.      On July 20, 2011, the FBI sent a letter to Mr. Lobsenz informing him that the matter was being referred to the United States Attorney's Office for the Western District of Washington.

## IV.   LEGAL BASIS FOR FORFEITURE

9.      The United States alleges that the Defendant Hit Money constitutes or is derived from proceeds traceable to a violation of Title 18, United States Code, Section 1958, Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire, which is a "specified unlawful activity" under Title 18, United States Code, Section

COMPLAINT FOR FORFEITURE IN REM - 2
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1956(c)(7)(A); as such, the Defendant Hit Money is subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(C).

## V. FACTUAL BASIS FOR FORFEITURE

10.     On or about May 8, 2009, the FBI - Seattle Division and the Seattle Police Department became aware of a murder-for-hire scheme involving Dr. Michael Emeric Mockovak ("Mockovak"), a co-owner of Clearly Lasik, Inc., a Seattle-based business that performed Lasik eye surgery procedures at eight different venues located in Washington, Oregon, Idaho, and British Columbia and Alberta, Canada.  The investigation determined that Mockovak had contacted a Clearly Lasik employee, Daniel Kultin ("Kultin"), about facilitating the murders of then co-owner, Dr. Joseph King ("King"), and former company president, Brad Klock ("Klock").  At that time, Kultin had been employed by Clearly Lasik for approximately four years and was responsible for maintaining the company's computer systems at all eight locations and for technical maintenance of the company's online advertising.  Kultin, a permanent U.S. citizen who had emigrated from Ulyanovsk, Russia, subsequently contacted the FBI and agreed to cooperate as a confidential source during his meetings with Mockovak.

### Mockovak's First Contact with Kultin

11.     In the spring of 2008, Mockovak approached Kultin while they were both at the Clearly Lasik office in Renton, Washington.  At that time, Mockovak jokingly asked if Kultin had any contacts with the Russian Mafia who might resolve his problems with Klock's wrongful termination lawsuit.

### Mockovak's Contacts with Kultin in Early 2009

12.     On or about April 10, 2009, Mockovak approached Kultin again at work and asked if Kultin had any Russian mafia connections who could take care of Klock. Mockovak was visibly upset, and Mockovak told Kultin that he was upset as the result of an issue related to Klock's lawsuit.

\\

\\

COMPLAINT FOR FORFEITURE IN REM - 3
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

13.    The following day, Mockovak approached Kultin in the office's break room and advised that Mockovak had learned that Klock would be traveling to Germany in the next month, and that it would be the perfect time and place to have Klock "eliminated."

**Kultin's Meetings with FBI in May-August 2009**

14.    On or about May 8, 2009, Kultin met with FBI Special Agent Lawrence D. Carr ("SA Carr") to discuss the information that had earlier provided to the FBI Portland Division. Kultin stated that since Mockovak's early 2009 inquiry about eliminating Klock in Germany, Mockovak had not again broached the subject. SA Carr advised Kultin not to bring up the matter with Mockovak, and that if Mockovak did, Kultin should only listen to what he had to say and provide no direction or contribution to the conversation.

15.    On or about June 11, 2009, Kultin met with SA Carr, wherein Kultin stated that Mockovak still had not brought up any conversation about eliminating Klock. Kultin stated that he had many conversations with Mockovak about life in Russia and Russian organized crime. During the meeting, Kultin informed SA Carr that he (Kultin) would be traveling to Los Angeles to visit some friends. Because Mockovak had previously asked Kultin if he had Russian Mafia connections, SA Carr directed Kultin to share with Mockovak that his friend in Los Angeles might have mafia connections.

16.    In early July 2009, SA Carr called Kultin, wherein Kultin described a brief conversation that he had with Mockovak. Kultin said that when he told Mockovak that he was going to Los Angeles and that his friends might have mob connections, Mockovak said that he would like to meet them. Mockovak brought up the possibility of Mockovak and Kultin traveling to Los Angeles for a weekend. Mockovak did not mention using these connections to arrange a murder.

17.    On or about August 3, 2009, Kultin contacted SA Carr and advised that Mockovak had called him to request a meeting to discuss "that thing they had talked about." Due to Mockovak's unusual cryptic tone, Kultin interpreted his request to be about their discussions concerning Mockovak's intended murder-for-hire.

COMPLAINT FOR FORFEITURE IN REM - 4
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

18.     On August 4, 2009, Kultin met with SA Carr and FBI Task Force Officer Len Carver, III ("TFO Carver"), and Kultin was formally named an FBI source.

**Meeting Between Kultin and Mockovak on August 5, 2009**

19.     On August 6, 2009, SA Carr and TFO Carver met and debriefed Kultin about his meeting with Mockovak on August 5, 2009.  Kultin reported the following:

20.     On August 5, 2009, at approximately 2:30 p.m., Kutlin met with Mockovak at Clearly Lasik's office in Renton.  During a walk around the office parking lot, Mockovak told Kutlin about plans to split the business in the fall of 2009.  Mockovak told Kutlin that he was upset with his current business partner, King, and Mockovak felt that there would be problems when the split of the business occurred.  Mockovak said that he was angry with the way that things had been going for him, and stated that, "I hate people taking advantage of me, like Joe [King], he is a greedy snake."  Mockovak told Kutlin that there was a $5 million life insurance policy on King, should something happen to King.  Mockovak further stated that, "If Joe [King] becomes a stumbling block, maybe we can look at him."

21.     The conversation then turned to the original target, Klock.  Mockovak stated, "I don't know how these things work?  What do I do?  Do we just have someone follow him?"  Kultin told Mockovak that he would make contact with his friend in Los Angeles.  According to Kultin, Mockovak was being guarded and careful with his words, but the tone of the meeting was clear—that Mockovak wished to move forward in developing a plan to have Klock murdered and that he also considering whether to have King murdered.  Mockovak told Kultin that Klock would be in Seattle on September 16-17, 2009, for mediation in his lawsuit.

22.     At the end of their meeting, Kultin and Mockovak agreed that Kultin would make contact with his people in Los Angeles.  Kultin told Mockovak that he would make inquiries as to how to proceed with eliminating Klock, and that they would meet again to discuss what he had learned.

\\

COMPLAINT FOR FORFEITURE IN REM - 5
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

23.     Kultin told agents that he believed Mockovak was moving away from

wanting Klock killed and starting to focus on his business partner, King.  SA Carr told

Kultin that at his next meeting with Mockovak, Kultin should relay the following story to

Mockovak:

> Kultin's contact in L.A. is a boyhood friend that Kultin grew up within
> Russia.  The friend had become an associate of a Russian crime group
> headed by Sergei Mikhailov.  That his friend would be able to arrange a
> murder of any target and conceal the murder as a street crime.  The cost
> would be $10,000 up front and another $10,000 upon completion.  The only
> thing that is needed is as much intelligence on the target as possible, the
> first installment, and the date of the intended "hit."

## Meeting Between Kultin and Mockovak on August 11, 2009

24.     On August 11, 2009, Kultin met with Mockovak at Clearly Lasik's Renton

office, and the two went out to lunch.  At lunch, Kultin relayed the above-referenced story

to Mockovak, as suggested by SA Carr.  Kultin further made it clear to Mockovak that the

individuals who could perform the murder for him were professionals; they don't make

mistakes.  Kultin advised Mockovak that unless Mockovak had a preference, the hitmen

would make it look like a carjacking "gone bad."  Kultin finally told Mockovak that

whether the victim cooperated or not, the hitmen would make sure that the victim was

dead by multiple gun shots to the body and head.

## Call From Mockovak to Kultin in October 2009

25.     On October 28, 2009, Kultin met with SA Carr and TFO Carver to discuss a

phone call that Kultin had received from Mockovak a few days before.  Kultin stated that

in this call, Mockovak said that he had been able to confirm that King would be traveling

to Austrailia on November 7, 2009, and staying there until November 14, 2009.

## Court-Authorization to Record Conversations Between Kultin and Mockovak

26.     On November 4, 2009, the Honorable Judge Julie Spector, King County

Superior Court, issued an Order Authorizing Interception and Recording of

Communications or Conversations Pursuant to RCW 9.73.090, authorizing law

enforcement to intercept and record the communications and conversations of Kultin with

Mockovak concerning the commission of the felony crimes of Criminal Conspiracy to

COMPLAINT FOR FORFEITURE IN REM - 6
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  Commit Murder in the 1st Degree, Criminal Solicitation to Commit Murder, in violation

2  of 18 U.S.C. §§ 1111 and 1117, and RCW 9A.28.030 and 9A.28.040. Case No. 09-2-

3  12056. The Order authorized said recordings between November 4, 2009, at 5:00 p.m.,

4  through November 11, 2009, at 5:00 p.m., or upon completion of the authorized

5  communications or conversations, whichever occurred first. The following summarized

6  conversations were made pursuant to that order.

7  **Recorded Meeting Between Kultin and Mockovak on November 6, 2009**

8          27.     On November 6, 2009, at approximately 8:00 p.m., Kultin met with

9  Mockovak at Maggiano's restaurant located at 10455 NE 8th Street, Bellevue, WA, for

10 the purpose of further discussing Mockovak's scheme to have King murdered. Kultin

11 wore both video and audio recording devices. Mockovak was already at the restaurant

12 awaiting Kultin's arrival. Because the meeting was being both video and audio recorded,

13 investigators placed a transmitter on Kultin so that the meeting between Mockovak could

14 be monitored in real time, negating the need for close in, "eyes on" surveillance. At one

15 point in the recording, Kultin assured Mockovak that his people would make sure that

16 King was dead; and that they don't make mistakes.

17         28.     Kultin asked Mockovak for a photograph of King, to give to the hitman.

18 Mockovak told Kultin that he had forgotten it because he had been too busy. Mockovak

19 told Kultin that he planned to go into the Clearly Lasik Vancouver office the following

20 day and take a photo of King and King's family off of the wall.

21         29.     Mockovak told Kultin that he had no idea how King was getting to

22 Australia. Mockovak said that he had called the airlines, but was unable to obtain King's

23 travel information because he did not have the credit card number used to purchase the

24 tickets. Mockovak said that he had also gone online to try to get King's travel itinerary.

25 Mockovak speculated on several possible routes that King could take to Australia, with

26 several different departure locations. Mockovak said that he had spoken with King and

27 tried to "pin him down" on where he was going and when. Mockovak said that King had

28 told him that he was leaving early Saturday afternoon, November 7, 2009. Mockovak

COMPLAINT FOR FORFEITURE IN REM - 7
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  then volunteered that King would have to get a phone number, so that people could get

2  ahold of him, and that if Mockovak could get King's number, that number could be traced

3  to a house (in Australia). Mockovak said that King told him that they planned to rent a

4  house on the beach. Mockovak added that King would probably rent a car. Mockovak

5  said that he would try to get King's number by calling King.

6      30.    Mockovak and Kultin continued talking and then moved their meeting to a

7  nearby coffee shop. Before leaving the restaurant, Mockovak can be seen on video taking

8  a credit or debit card from his wallet to pay the bill. After relocating to a nearby coffee

9  shop, Kultin told Mockovak, "They want to know what the target looks like....Once they

10  find the person, that person's dead." Mockovak promised that he would get a photograph

11  of King the next day and deliver it to Kultin that same evening. In response to Kultin's

12  question about how Mockovak wanted the murder done, Mockovak replied that he

13  thought drowning in the ocean sounded "not bad." Mockovak went on to tell Kultin that

14  King would probably run on the beach about five miles everyday, and that King's wife

15  and kids would not likely be with him at that time. In response to Kultin's question about

16  whether Mockovak wanted King's body found, Mockovak responded that he (Mockovak)

17  probably needed the body found for insurance purposes. Mockovak then went on to talk

18  about the life insurance that their medical practice had on King, and Mockovak

19  speculated that King's surviving wife would probably get about half of the proceeds,

20  implying that Mockovak or the practice would get the other half. Mockovak went on and

21  called King a "mother******," and said that King "had it coming." Mockovak also said

22  that, "I just want him [King] out of my way;" but that he doesn't have any personal

23  vengeance toward King, but he added, "with BRAD [Klock] I do." Mockovak

24  complained to Kultin about his legal troubles and talked about his expectations of how the

25  business would be split up if he and King continued working with attorneys on the matter.

26  Mockovak again told Kultin that King had it coming and said that, "The only way is this."

27  Mockovak then switched gears and talked about Klock and his grievances with Klock,

28  and stated, "BRAD [Klock] really has it coming."

COMPLAINT FOR FORFEITURE IN REM - 8
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

31.     At one point in the conversation, Mockovak told Kultin that he had seen a
flash and thought that someone was taking photographs.  Mockovak became nervous, and
Kultin suggested that they leave the coffee shop.  The two went to Kultin's car, and
Kultin drove Mockovak to his car, where they continued talking.  Mockovak told Kultin
that he was concerned about taking a lot of money out of his account immediately after
King's murder, fearing that it would look suspicious.  Mockovak told Kultin that he had
been taking money out of his account slowly, over the past weeks, and had pulled $13,000
already.  Kultin and Mockovak discussed laundering the balance due through the
purchase of something of value.  Mockovak told Kultin that he had already transferred
enough money from a Canadian account, to an account in the United States, for the
purpose of buying a car, so he had the money in U.S. currency.  At the end of the
conversation, Mockovak offered to pay Kultin $100,000 for his role in arranging King's
murder.  Mockovak suggested that this payment to Kultin would be made from the
proceeds of the insurance payout on King's life insurance policy that he had previously
mentioned.

**Recorded Call Between Kultin and Mockovak on November 7, 2009**

32.     On November 7, 2009, at approximately 5:00 p.m., Kultin returned a phone
call to Mockovak.  The call was made from the Seattle FBI office located at 1110 3rd
Avenue, and the conversation was recorded pursuant to court authority.  In this
conversation, Mockovak told Kultin that he was at the Portland Airport about to board a
flight back to Seattle.  Mockovak informed Kultin that he was able to obtain a photograph
of the King family and that he had the $10,000 cash with him.  Mockovak added that he
was glad that he and Kultin had met the night before, because it had given him
(Mockovak) 24 hours to think about it, and that he (Mockovak) had come to the
conclusion that "this" (the murder of King) was "absolutely the right thing to do."  The
two arranged to meet later that evening at the Starfire Sports Complex in Tukwila,
Washington.

\\

COMPLAINT FOR FORFEITURE IN REM - 9
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

**Recorded Meeting Between Kultin and Mockovak on November 7, 2009**

33.     On November 7, 2009, before Mockovak's arrival at the Starfire Sports Complex, agents provided Kultin with a clothing item that contained both audio and video recording equipment and a live transmitter.  Agents were present in the complex's parking lot as Kultin awaited Mockovak's arrival.  At approximately 7:00 p.m., Kultin informed agents through the live transmitter that Mockovak had called him and was arriving at the sports complex.  Within minutes, agents observed a black four-door Lexus arrive at the sports complex.  Based on information from both the Washington Department of Licensing and Kultin, agents knew that Mockovak owns and regularly drives a black 2003 Lexus ES, four-door sedan, bearing Washington license plate number 163-VKK.  Within minutes, via the live transmitter, agents could hear as Mockovak met Kultin near the main stadium.

34.     Kultin and Mockovak quickly moved their meeting into the men's restroom at the soccer field.  Mockovak gave Kultin a cardboard United Parcel Service ("UPS") shipping envelope that contained a large, folded, color photograph of the King family.  Mockovak then handed Kultin $10,000 in $100-dollar bills (which is the Defendant Hit Money).  Mockovak asked Kultin what would happen if "they don't get him," and inquired if he would lose his money.  Mockovak insisted that Kultin go into a bathroom stall to count the money, so no one would see him doing it.  Kultin entered a bathroom stall and counted the cash.

35.     Kultin and Mockovak continued their earlier discussion about how Mockovak would launder the remaining $15,000, owed after the murder, and settled on the idea that Mockovak would make it look like an Internet purchase of an expensive item on his credit card.  Kultin commented to Mockovak that he was probably "gonna be the first person to charge a murder on a credit card."  Mockovak laughed heartily at this comment.  Mockovak told Kultin that he had searched flights online, trying to come up with the most likely flight itinerary for King's family vacation to Australia.  Mockovak then gave Kultin a hand-written note on a yellow Post-It that contained King's flight

COMPLAINT FOR FORFEITURE IN REM - 10
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1    information for the flight to Sydney.  Mockovak also told Kultin that the photograph he

2    had given Kultin was dated, and that the kids were older now and that King had a third

3    child.  The photograph showed King, his wife, and two of their three children.  Mockovak

4    repeated that he expected King to run on the beach when nobody would be around, which

5    Mockovak said would be a good time to kill King.  During this meeting, Mockovak was

6    visible and clearly identifiable on video.

7            36.    Agents observed Mockovak as he left the Starfire soccer complex, driving a

8    black 2003 Lexus ES, four-door vehicle.  Agents could not see the license plate of the

9    vehicle as it left, but it appeared to be the same Lexus sedan that agents had seen arriving.

10   **Seizure of the Defendant Hit Money**

11           37.    Following the meeting, agents immediately met up with and debriefed

12   Kultin.  Kultin gave to agents the UPS shipping envelope, the color photograph of King

13   and his family, the handwritten Post-It note with flight information, and the Defendant

14   Hit Money.  These items were retained as evidence at the FBI in Seattle.

15   **Arrest of Mockovak**

16           38.    On November 12, 2009, at approximately 8:00 a.m., agents located and

17   arrested Mockovak near his home in Newcastle, Washington.  Following his arrest,

18   agents advised Mockovak of the nature and circumstances of his arrest and explained his

19   *Miranda* warnings.  Mockovak was subsequently booked into the King County Jail.

20   **Execution of Search Warrant on Mockovak's Residence**

21           39.    On November 12, 2009, at approximately 1:05 p.m., agents sought a state

22   search warrant for Mockovak's residence and automobile, including all cellular

23   telephones and computers.  The Honorable Michael C. Hayden, King County Superior

24   Court, granted the request and issued the search warrant on November 12, 2009.  Case

25   No. 09-595.

26           40.    Agents executed the above-referenced search warrant on Mockovak's home

27   on November 12, 2009.  Evidence seized from Mockovak's home included the following:

28   papers of dominion and control; evidence of United States and Canadian-based bank

COMPLAINT FOR FORFEITURE IN REM - 11
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   accounts; documents of and relating to life insurance policies on himself and King;

2   evidence of indebtedness to the government (taxes) and other private entities, much of

3   which appeared to be delinquent and lawsuit-pending; handwritten notes regarding the

4   dissolution of the business known as "Clearly Lasik;" computers and digital media;

5   formal management-related and severance material related to the dissolution of Clearly

6   Lasik; a photograph of intended victim, King; financial statements; a 2003 Lexus sedan,

7   Washington license plate number 163VKK; a cell phone; and clothing worn by

8   Mockovak during his audio-video recorded meetings with Kultin.

9   **Interview of Dr. King**

10   41.   On November 15, 2009, agents met with Dr. King at the Seattle FBI office.

11   When King was shown the photograph that Mockovak had given Kultin during the

12   meeting at the Starfire complex on November 7, 2009, King said that he recognized it and

13   believed it had come from the Clearly Lasik Vancouver, WA, office.  King said that he

14   believed the photograph had been framed and hung on the office wall.  Finally, King

15   confirmed for agents that Mockovak had purchased a $4 million life insurance policy

16   naming King as the insured while Mockovak was the policy owner and sole beneficiary.

17   **State Criminal Charges Against Mockovak**

18   42.   On November 16, 2009, an Information was filed in *The State of*

19   *Washington v. Michael Emeric Mockovak*, Case No. 09-1-07237-6 SEA, charging

20   Mockovak with the following offenses: Count I: Solicitation to Commit Murder in the

21   First Degree of King, in violation of RCW 9A.28.030(1) and 9A.32.030(1)(a); and Count

22   II: Solicitation to Commit Murder in the First Degree of Klock, in violation of RCW

23   9A.28.030(1) and 9A.32.030(1)(a).

24   43.   On January 26, 2011, a Second Amended Information was filed in the

25   above case, charging Mockovak with the following offenses: Count I: Solicitation to

26   Commit Murder in the First Degree of Klock, in violation of RCW 9A.28.030(1) and

27   9A.32.030(1)(a); Count II: Solicitation to Commit Murder in the First Degree of King, in

28   violation of RCW 9A.28.030(1) and 9A.32.030(1)(a); Count III: Attempted Murder in the

COMPLAINT FOR FORFEITURE IN REM - 12
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  First Degree of King, in violation of RCW 9A.28.020 and 9A.32.030(a); Count IV:

2  Conspiracy to Commit Theft in the First Degree of the $4 million life insurance proceeds

3  on King's life, in violation of RCW 9A.28.040, 9A.56.030(1)(a), and 9A.56.020(1)(a)

4  and (b); and Count V: Attempted Theft in the First Degree on or about November 7,

5  2009, of the $4 million life insurance proceeds on King's life, in violation of RCW

6  9A.28.020, 9A.56.030(1)(a), and 9A.56.020(1)(a) and (b).

7  **State Criminal Convictions of Mockovak**

8  　　　　44.　　On February 3, 2011, Mockovak was found guilty by jury verdict of the

9  following offenses charged in the Second Amended Information: Count II: Solicitation to

10  Commit Murder in the First Degree of King; Count III: Attempted Murder in the First

11  Degree of King; Count IV: Conspiracy to Commit Theft in the First Degree of the $4

12  million life insurance proceeds on King's life; and Count IV: Attempted Theft in the First

13  Degree of the $4 million life insurance proceeds on King's life.  Judgment and

14  Sentence–Felony, March 17, 2011.  The conviction is currently on appeal, Washington

15  State Court of Appeals Case number 669249.

16  **Consent to Forfeiture of Defendant Hit Money by Kultin**

17  　　　　45.　　On March 22, 2011, Kultin signed a Consent to Forfeiture form waiving his

18  rights to timely notice concerning the seizure of the $10,000 Defendant Hit Money.

19  **VI.　　CONCLUSION**

20  　　　　46.　　By reason of the foregoing, there is probable cause to believe that the

21  Defendant Hit Money constitutes or is derived from proceeds traceable to a violation of

22  Title 18, United States Code, Section 1958, Use of Interstate Commerce Facilities in the

23  Commission of Murder-for-Hire, which is a "specified unlawful activity" under Title 18,

24  United States Code, Section 1956(c)(7)(A).  Therefore, the Defendant Hit Money is

25  subject to forfeiture to the United States of America pursuant to Title 18, United States

26  Code, Section 981(a)(1)(C).

27  \\

28  \\

COMPLAINT FOR FORFEITURE IN REM - 13
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

| | |
|---|---|
| 1 | ***** |
| 2 | WHEREFORE, Plaintiff prays that due process is issued to enforce the forfeiture |
| 3 | of the Defendant Hit Money, that due notice be given to all interested persons to appear |
| 4 | and show cause why forfeiture of the defendant currency should not be decreed, that the |
| 5 | Defendant Hit Money be condemned as forfeited to the United States to be disposed of |
| 6 | according to law, and for such other and further relief as this Honorable Court may deem |
| 7 | just and proper. |

DATED this 14th day of October, 2011, in Seattle, Washington.

Respectfully submitted,

JENNY A. DURKAN
United States Attorney

RICHARD E. COHEN
Assistant United States Attorney
Federal Building & U.S. Courthouse
700 Stewart Street, Suite 5220
Seattle, WA 98101
Telephone: (206) 553-3665
Fax: (206) 553-6934
Email: Richard.E.Cohen@usdoj.gov

COMPLAINT FOR FORFEITURE IN REM - 14
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1
2

## VERIFICATION OF COMPLAINT

3

4 | STATE OF WASHINGTON )

5 | COUNTY OF KING        )  ss
                         )

6      I, LEN CARVER, III, declare under penalty of perjury that the following is true

7 and correct to the best of my knowledge:

8      I am a Task Force Officer with the Federal Bureau of Investigation, and am

9 assigned to this case. I have read the attached Complaint and know the contents thereof; I

10 have furnished the information contained in the Complaint based upon my own

11 investigation and that of other reliable official Government sources; and, based on

12 information and belief, the allegations contained in the Complaint are true.

13      EXECUTED this _14_ day of October, 2011.

14

15

16                                      LEN CARVER, III
                                        Task Force Officer
17                                      Federal Bureau of Investigation

18      SUBSCRIBED and SWORN to before me this _14th_ day of October, 2011, by Len

19 Carver, III.

20

21      MEGAN SEABORN           Print: _Megan Seaborn_
        STATE OF WASHINGTON
22      NOTARY PUBLIC           Notary Public in and for the
        MY COMMISSION EXPIRES   State of Washington, residing at _Seattle_
23          05-23-14            Expires: _5-23-14_

24

25

26

27

28

COMPLAINT FOR FORFEITURE IN REM - 15
U.S. v. $10,000.00 MORE OR LESS IN U.S. CURRENCY